SHEPHERD, Circuit Judge.
Ronnie Whisenton pled guilty to one count of conspiracy to distribute marijuana in violation of 21 U.S.C. §§ 841(b)(1)(B) and 846. The district court[1] sentenced him to 60 months imprisonment. Whisen-ton appeals the district court’s denial of his motion to suppress evidence. We affirm.
I.
We recite the facts as the district court found and stated them in its order denying Whisenton’s motion to suppress. See United States v. Ellis, 501 F.3d 958, 961 (8th Cir.2007). On the morning of March 1, 2012, a task force of federal agents and local police officers (the agents) followed Adrian Renee Bollinger to a residence in St. Louis. The agents had been tracking Bollinger because of her suspected involvement in drug trafficking. Bollinger pulled into the residence’s driveway and parked. Shortly after, a man, later identified as Whisenton, exited the house and entered Bollinger’s car. The agents saw Whisen-ton and Bollinger bend down in the vicinity of an area of the car the agents knew contained a hidden compartment.[2] Whi-senton remained in the car for a few min *940 utes and then, carrying a grocery bag, returned to his house. Bollinger drove away from the house. Shortly after, local police officers stopped her for a traffic violation. Bollinger refused consent to search her car, but a canine alerted the officers to drugs in the car. The agents searched the vehicle and discovered approximately $73,000 in the hidden compartment.
That afternoon, the agents returned to Whisenton’s house. The agents decided to utilize a “knock and talk” tactic[3] to gain consent to search the house. They requested a records check on the occupants of the house, which revealed that one of the occupants had a criminal record for guns and drugs. While setting up surveillance on the house, the agents saw a woman exit and walk toward a car. The agents approached the woman, who was wearing a correctional officer uniform, and asked her if they could search the house. The woman responded that she would have to ask her husband Whisenton, the owner of the house, who was in the shower at the time. Whisenton’s wife entered the house, and about 30 seconds later, the agents knocked on the door. The agents later testified that when Whisenton’s wife entered the house, they immediately feared for their safety because, as a correctional officer, she would presumably have access to a weapon. Moreover, the background check indicated that one of the occupants had a criminal history that included firearm possession. About 10 seconds after the agents knocked, Whisenton’s wife returned and opened the door. At that point, the agents pushed her back from the door and, with guns drawn, entered the house.
Once inside, the agents directed Whi-senton to sit on the couch as they conducted a protective sweep. After the sweep, the agents asked Whisenton for consent to search. Whisenton did not respond. Still on the couch, Whisenton asked the agents if he could smoke a cigarette. The agents permitted him to smoke, and, as he finished, the agents again asked him if they could search the house. Once again Whisenton did not respond. The agents informed Whisenton that they would obtain a search warrant if he did not provide consent to search, and Whisenton and the agents discussed whether the agents were going to tear up his house. After that discussion, Whisen-ton consented to the search, both orally and through a written consent form. The consent form, which Whisenton signed, stated that he “ha[d] been informed by [the agents] of [his] right to refuse consent to a search of [his] property,” he “voluntarily and intentionally consented] to allow [the agents] to search [his] property,” and his consent was “freely given and not the result of any promises, threats, coercion, or other intimidation.” Order at 7-8. While the search was underway, Whisenton entered the kitchen so Agent Dean O’Hara could interview him. O’Hara orally informed Whisenton of his Miranda rights, and Whisenton proceeded to discuss his criminal activities with O’Hara. During the interview, Whisen-ton’s wife left the premises and returned with Whisenton’s mother. Whisenton’s mother informed him that he should not cooperate with the agents, but Whisenton responded that he knew what he was doing and told her she could leave. As a result of the search, the agents seized two firearms, more than $100,000 in cash, and other drug evidence.
*941 Whisenton was indicted on one count of conspiracy to distribute marijuana. Whi-senton filed a motion to suppress all evidence recovered during the search of his home and all statements made to agents on March 1, 2012, the date of the search. The Magistrate Judge agreed with Whi-senton that exigent circumstances did not justify the agents’ warrantless entry into Whisenton’s home. Nevertheless, the Magistrate Judge recommended that the district court deny Whisentoris motion. He reasoned that the evidence was admissible because there was a sufficient break between the agents’ warrantless entry and Whisentoris grant of consent to search and his statements to the agents. The district court agreed and denied Whisentoris motion to suppress.
II.
Whisenton appeals the district court’s denial of his suppression motion, arguing that the Government failed to show that his “consent was an independent act of [his] free will that purged the taint of the Fourth Amendment violation.” See United States v. Greer, 607 F.3d 559, 564 (8th Cir.2010). The Government contends that exigent circumstances justified the agents’ entry, and even if the entry was illegal, that Whisentoris consent to search was sufficient to “purge the primary taint of the [illegal] entry.” Id.
We agree with the Government that Whisentoris consent to search was an act of free will sufficient to purge the taint of the claimed Fourth Amendment violation. For purposes of our analysis, we assume that exigent circumstances did not justify the agents’ warrantless entry into Whisentoris home, and thus, the agents violated the Fourth Amendment. See United States v. Barnum, 564 F.3d 964, 969 (8th Cir.2009) (assuming an officer’s traffic stop without probable cause violated the Fourth Amendment for purposes of considering whether the defendant’s voluntary consent purged the taint of the alleged violation). We review the district court’s factual determinations for clear error and its legal conclusions de novo. See id. at 968. When an illegal entry precedes a defendant’s grant of consent to search, the Government must show (1) that the defendant’s consent was voluntary and (2) that “the consent was an independent act of [the defendant’s] free will that purged the taint of the Fourth Amendment violation.” See Greer, 607 F.3d at 564; United States v. Lakoskey, 462 F.3d 965, 975 (8th Cir.2006). To determine whether the defendant’s consent purged the taint of the illegal entry, we consider “(1) the temporal proximity between the Fourth Amendment violation and the grant of consent to search; (2) the presence of any intervening circumstances; and (3) the purpose and flagrancy of the [agents’] Fourth Amendment violation.” See Barnum, 564 F.3d at 971. We also consider “the giving of Miranda warnings where applicable.” Greer, 607 F.3d at 564. Whisenton focuses his appeal on whether his consent to search purged the taint of the illegal entry.
The temporal proximity between the illegal entry and the consent to search is relevant to whether “the defendant’s consent was influenced by, or the product of, the police misconduct.” See Barnum, 564 F.3d at 972. We measure temporal proximity from the point at “which the [agents’ conduct] became illegal to the time of the consent.” United States v. Esquivel, 507 F.3d 1154, 1160 (8th Cir.2007). The closer in time the illegal entry and the defendant’s consent occurred, the more likely the illegal entry influenced the consent. See Barnum, 564 F.3d at 972. Here, fifteen minutes elapsed between the agents’ illegal entry into the house and Whisentoris consent to search. Under our *942 precedent, fifteen minutes is sufficient to demonstrate an attenuation of the illegality. See, e.g., id. (twelve to fifteen minutes); Esquivel, 507 F.3d at 1160 (nine and one-half minutes). That the agents requested consent twice before Whisenton eventually granted it does not alter this conclusion. Because an agent does not violate the Fourth Amendment by merely requesting consent to search, see United States v. Martinez, 168 F.3d 1043, 1047 (8th Cir.1999), the agents’ multiple attempts to obtain consent, absent threats or coercion, do not constitute “police misconduct.” Moreover, as examined more fully below, each request provided Whisenton a fresh opportunity to consider whether he should grant consent. In sum, the temporal proximity between the illegal entry and Whisenton’s consent weighs in favor of the Government.
The presence of intervening circumstances that provide the defendant an opportunity “to pause and reflect, to decline consent, or to revoke consent” help demonstrate that the illegality was attenuated. See Greer, 607 F.3d at 564. Here, two notable intervening circumstances occurred prior to Whisenton’s grant of consent. First, the agents permitted Whisen-ton to smoke a cigarette and ask questions about how the agents would search his house. Whisenton specifically asked whether the agents would “tear up his house” if he granted them consent to search. Whisenton’s questioning of the agents as to the manner of their search demonstrates his deliberate consideration of the situation, indicating the type of reflection the Greer court found to be critical. See id. Second, the consent form Whisenton signed advised him that he was not required to grant consent. See id. (noting that “the consent form advised [the defendant] that he had a ‘right to deny the officer(s) permission to search [his] property’ ” (second alteration in original)); United States v. Moreno, 280 F.3d 898, 901 (8th Cir.2002) (noting that the officer “advised [the defendant] that he had the right to refuse to consent to the search”). Moreover, after Whisenton granted consent, the agents orally advised him of his Miranda rights and provided him an opportunity to speak with his mother. These events are meaningful, despite occurring after the initial grant, because Whisenton never attempted to revoke consent after these events occurred. See Greer, 607 F.3d at 564 (noting that the defendant could have revoked consent). Whisenton continued to interact congenially with the agents despite his mother’s disapproval of his decision to allow the agents to search. In fact, the district court noted that Whi-senton “informed his mother that he knew what he was doing, and told her that she could leave.” Order at 15. The second factor weighs heavily in favor of the Government.
The final factor addresses the purpose and flagrancy of the agents’ Fourth Amendment violation. See United States v. Herrera-Gonzalez, 474 F.3d 1105, 1111 (8th Cir.2007); see also Greer, 607 F.3d at 564 (“The Supreme Court has placed ‘particular’ emphasis on the purpose and flagrancy of the official misconduct.” (citing Brown v. Illinois, 422 U.S. 590, 604, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975))). To analyze whether conduct was purposeful and flagrant, we have often asked whether the violation “ ‘was investigatory in design and purpose and executed in the hope that something might turn up.’ ” See Barnum, 564 F.3d at 973 (quoting Herrera-Gonzalez, 474 F.3d at 1113). We have also considered the manner of entry, the amount of force used, and the presence of threats or intimidation. See Greer, 607 F.3d at 564 (noting that the “the door to the residence was open, and the officers used no force to gain access”). Though it declined to fully *943 elaborate, the district court found that the agents entered Whisenton’s house for multiple reasons, only one of which involved obtaining consent to search. See Order at 15. A fair reading of the district court’s order indicates that the agents’ safety concerns also motivated their decision to enter. See United States v. Barker, 437 F.3d 787, 789 (8th Cir.2006) (“This court will uphold the district court’s decision on the motion to suppress if, on review of the record, ‘any reasonable view of the evidence supports’ the district court’s decision.” (quoting United States v. Bloomfield, 40 F.3d 910, 913 (8th Cir.1994) (en banc))). Several agents testified that they entered the house because they feared the situation had become dangerous. See, e.g., Evidentiary Hr’g Tr. at 15-16, 91-94, 163-65. Though we have assumed exigent circumstances did not independently justify the agents’ entry, their safety concerns are nonetheless relevant in considering their mixed purposes for entering Whisenton’s house.
In addressing the final factor, the district court focused its findings on the agents’ manner of entry and their conduct once inside. The court found “[tjhere was no forced entry or violent entry, no threats or promises were made to [Whisenton], at no time was [Whisenton] handcuffed, and the credible evidence reveals the interaction was cooperative and calm.” Order at 15. The lack of force used to enter and the agents’ cordial and professional conduct after entering suggest that Whisen-ton’s consent was an independent act of free will. See United States v. Conrad, 673 F.3d 728, 736 (7th Cir.2012); see also Herrera-Gonzalez, 474 F.3d at 1114 (“[E]ven if there was [misconduct], it was certainly not flagrant.”). To conclude, the final factor presents a mixed picture, slightly weighing in favor of the Government. Though the agents entered Whi-senton’s house with mixed motives, including a partially-investigatory motive, the agents’ entry was not flagrant and the agents conducted themselves professionally once inside.[4]
Our final balancing of the three factors weighs in favor of the Government. We hold that Whisenton’s grant of consent to search was the product of free will sufficient to purge the taint of any Fourth Amendment violation occurring by virtue of the agents’ entry. For the same reason, we hold that the district court did not err in admitting Whisenton’s statements to Agent O’Hara.
III.
The judgment of the district court is affirmed.

. The Honorable E. Richard Webber, United States District Judge for the Eastern District of Missouri, adopting the report and recommendations of the Honorable Terry I. Adel-man, United States Magistrate Judge for the Eastern District of Missouri.

. The hidden compartment was discovered during a traffic-stop search of Bollinger’s car conducted a month earlier.

. A police technique where agents "knock[] on the door and seek[] to speak to an occupant for the purpose of gathering evidence.” Florida v. Jardines, — U.S. —, 133 S.Ct. 1409, 1423, 185 L.Ed.2d 495 (2013) (Alito, J„ dissenting).

. The dissent places too much weight on discrepancies between a post-search internal report, in which, according to the dissent, the agents "strongly implied they received consent to enter Whisenton’s home,” and the "version of events now offered by the Government.” Post, at 945. The report is silent as to how the agents entered Whisenton’s house. Def.’s Mot. Suppress Evidence Statements, Attach. A, at 3, ECF No. 22. Even Whisen-ton acknowledged that the report never explicitly declared the agents received consent to search prior to entering the house. Def.’s Mot. Suppress Evidence Statements at 2 n. 3, ECF No. 22. Though the report could have contained more details, the agent’s poor drafting is not particularly relevant to "the purpose and flagrancy of the [agents'] Fourth Amendment violation,” see Bamum, 564 F.3d at 971, and we will not assume "improper motive or malicious intent,” see id. at 973 n. 9.