# United States Court of Appeals
## For the Eighth Circuit

_____

No. 14-1502
_____

United States of America,

*Plaintiff - Appellee*,

v.

Andrew David Brandwein,

*Defendant - Appellant*.
_____

Appeal from United States District Court
for the Western District of Missouri - Jefferson City
_____

Submitted: January 16, 2015
Filed: August 12, 2015
_____

Before COLLOTON, BEAM, and KELLY, Circuit Judges.
_____

COLLOTON, Circuit Judge.

Andrew Brandwein was charged with unlawful possession of firearms as a previously convicted felon and attempted manufacturing of methamphetamine. Before trial, he moved to suppress evidence seized during a search of his residence

and statements made as a result of the search. The district court[1] denied the motion, and a jury convicted Brandwein of unlawful possession of a firearm, but acquitted him of the methamphetamine charge. Brandwein appeals the district court's denial of his motion to suppress, and we affirm.

I.

On January 8, 2011, a shed on the rural property leased by Andrew Brandwein and his wife, Debra, caught fire. Two neighbors placed a call for emergency assistance and then approached the nearby house where the Brandweins lived. One of the neighbors knocked on the door and shouted to determine if anyone was present, but received no response. Concerned that a pickup truck parked very close to the burning shed would catch fire, the neighbor moved the truck using keys he found in the truck's ignition. The neighbor also noticed a small dog inside the pickup truck, and a rifle laying on the ground near the truck.

When Deputy Arthur Brown of the Cole County, Missouri Sheriff's Department arrived at the scene at approximately 7:15 p.m., the fire department was already present. A firefighter told Brown about the truck that had been moved, the rifle, and the small dog. Brown thought all of these circumstances were suspicious, and he placed a call to Sergeant Troy Thurman to request his assistance at approximately 7:30 p.m. After Sergeant Thurman arrived at 7:45 p.m., Deputy Brown briefed him on information he had learned from the firefighters. Thurman examined the rifle and discovered that it was loaded. He also noted that the rifle was found in what appeared to be a makeshift firing range consisting of a sandbag placed on a log.

---

[1]The Honorable Brian C. Wimes, United States District Judge for the Western District of Missouri, adopting the report and recommendation of the Honorable Matt J. Whitworth, United States Magistrate Judge for the Western District of Missouri.

The two police officers spoke with the son of the man who owned the property where the Brandweins resided. According to the officers, he informed them that all of the Brandweins' vehicles were present on the property. At this point, several emergency vehicles had responded to the scene, and their lights and sirens had operated directly outside of the house. Sergeant Thurman and Deputy Brown also knocked loudly on the door four or five times and announced their presence. The officers professed concern that the circumstances suggested that there may be injured or deceased persons inside the home. The district court, after evaluating the testimony of the officers, found that they were "very concerned for the welfare of the residents of the home and assumed or suspected they were likely inside and possibly deceased or injured."

After receiving no response to their knocks, the officers used the keys that had been found in the truck to enter the house. Once inside, they observed drug paraphernalia in plain view on the dining room table. The police also saw several firearms in plain view in the living room. The officers continued to announce their presence, and Brandwein emerged from the master bedroom. He was fully dressed, sweating profusely, and seemed to be disoriented and confused. Brandwein informed the officers that Debra was out shopping.

Debra called the Brandwein residence at shortly after 8:00 p.m. and returned home when she was informed of the fire. When Debra arrived at the property, Detective Colin Murdick first allowed her to check on her husband. Detective Murdick then interviewed her separately, first outside the house and then in the kitchen, explaining that he suspected the fire may have been caused by a methamphetamine lab. While they were speaking in the kitchen, Murdick noticed two large glass jars containing a white residue that he believed to be methamphetamine. Accordingly, Murdick informed Debra that he was going to secure the residence and apply for a search warrant. Officers told Debra that she was free to leave, but then acceded to her request to stay with her husband in the living

-3-

room. The officers instructed Debra not to touch anything, referring specifically to the jars in the kitchen that were believed to contain methamphetamine.

Detective Murdick then contacted Sergeant Shannon Jeffries with the area drug task force to request his assistance, and he arrived at approximately 9:00 p.m. Murdick and Jeffries interviewed Debra a second time outside the house. Jeffries asked Debra for permission to search the residence. The district court found that Debra first asked Jeffries why they wanted to search the house, and he responded that the officers had found items associated with the manufacture of methamphetamine and wanted to determine if there were any other illegal items in the house. The district court found that Debra then consented to the search.

Detective Murdick returned to the kitchen, where he saw that the two jars containing the white residue suspected to be methamphetamine had been washed and placed in the sink. Murdick asked Deputy Brown whether anyone had accessed the kitchen. Brown, who had not been aware of the jars, responded that he had permitted Debra to fetch a glass of water from the kitchen. Debra was placed under arrest for suspected tampering with evidence. According to the government, she later admitted to the tampering in an interview at the local jail. Brandwein also made incriminating statements. The government alleged that Brandwein admitted that his wife had cleaned the jars, that he used and manufactured methamphetamine, and that he owned one of the firearms found in the residence.

A grand jury charged Brandwein with the unlawful possession of six firearms as a previously convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), and attempted manufacturing of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), and 846. He moved to suppress all evidence obtained during the search of his home, including the firearms, drug paraphernalia, and statements he later made to the police. The district court denied the motion, ruling that the entry to

-4-

the house was permissible under the "community caretaker" doctrine and that Debra freely and voluntarily consented to the search.

## II.

Brandwein contends on appeal that police violated the Fourth Amendment by searching his house. He contends that evidence found in the house, and statements made after the search, should have been suppressed as the fruits of an unlawful search. We review the district court's findings of fact for clear error and its application of the Fourth Amendment *de novo*.

The Fourth Amendment generally prohibits police from entering a residence without a warrant, *Payton v. New York*, 445 U.S. 573, 589-90 (1980), but there are exceptions to the rule. One exception, invoked by the government here, is the authority of police to undertake so-called "community caretaking functions." These are activities "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski*, 413 U.S. 433, 441, 447-48 (1973). They include actions "undertaken to help those in danger and to protect property." *United States v. Quezada*, 448 F.3d 1005, 1007 (8th Cir. 2006). Police, therefore, may enter a home without a warrant, in the exercise of community caretaking, "where the officer has a reasonable belief that an emergency exists requiring his or her attention." *Id.* at 1007; *see Burke v. Sullivan*, 677 F.3d 367, 371 (8th Cir. 2012).

Whether community caretaking justified the warrantless entry to Brandwein's home presents a debatable question here. The district court reasoned that Deputy Brown and Sergeant Thurman reasonably believed that someone likely was present in the residence and in need of assistance. The government defends this conclusion, citing the burning shed, the unattended loaded rifle and small dog, the officers' belief

based on the presence of vehicles that someone likely was home, and the failure of anyone inside the house to respond to knocks, shouts, lights, and sirens.

Brandwein contends that there was no reasonable basis for believing that an emergency existed in his residence, because there was no sign that anyone was home or was injured. He argues that the officers misconstrued statements that all of the vehicles on the property belonged to the Brandweins to mean that all of the Brandweins' vehicles were present, and therefore drew an unreasonable inference that someone must be inside. In his view, the entry was a pretext for investigating criminal activity. Brandwein also asserts that the officers did not enter the residence until an hour after Deputy Brown first arrived, and that this timing suggests they did not really believe there was an emergency.

We may affirm on any ground supported by the record, *United States v. Wells*, 347 F.3d 280, 287 (8th Cir. 2003), and we find it unnecessary to resolve whether community caretaking justified the entry. Even assuming for the sake of analysis that the circumstances fell short of supporting a reasonable belief in the existence of an emergency, the district court found that Debra Brandwein later consented voluntarily to a search of the residence. We conclude that her consent was sufficient to purge any taint of an unlawful entry that we will assume had occurred and to support admission of the disputed evidence.

Brandwein argues that the district court clearly erred in finding that Debra's consent was voluntary. His argument relies in part on a challenge to the court's credibility findings. The district court believed the testimony of the officers that Debra consented, and this credibility finding is virtually unreviewable on appeal. The court, citing Debra's efforts to protect her husband by destroying evidence in the kitchen, permissibly rejected Debra's contrary testimony as lacking in credibility.

-6-

Brandwein also contends that the environment in which Debra consented undermines its voluntariness. He claims that police officers already had entered the home before Debra arrived, that police escorted her to the residence, that numerous officers were present in the home, that his own movement was restricted, and that an officer previously told Debra that police were securing the home to obtain a search warrant. Other circumstances, however, support the district court's finding of voluntariness. The district court found that Debra gave consent when asked by two officers who did not make any threats or promises. Officers told Debra that she was free to leave; although she chose to stay with her husband, Debra was not detained or under arrest. That police were present and told Debra about efforts to obtain a search warrant does not dictate a finding that later-given consent was the product of coercion or duress. *United States v. Williams*, 760 F.3d 811, 816 (8th Cir. 2014); *United States v. Muhlenbruch*, 634 F.3d 987, 999 (8th Cir. 2011); *United States v. Larson*, 978 F.2d 1021, 1024 (8th Cir. 1992). We do not think restrictions on *Brandwein's* movement undermine the district court's finding about *Debra's* free will. Under the totality of the circumstances, there was no clear error in finding voluntary consent.

To vitiate the unlawfulness of an entry, consent to a search must be both voluntary and "an intervening independent act of a free will" sufficient "to purge the primary taint of the unlawful invasion." *Brown v. Illinois*, 422 U.S. 590, 598 (1975) (internal quotation marks omitted); *see United States v. Greer*, 607 F.3d 559, 563-64 (8th Cir. 2010). Whether consent sufficiently disperses the taint of an unlawful entry is determined by reference to "temporal proximity" between the entry and the consent, "the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct." *Brown*, 422 U.S. at 603-04 (internal citation omitted). Observance of the *Miranda* rule is also relevant where applicable. *Kaupp v. Texas*, 538 U.S. 626, 633 (2003).

The Supreme Court places a particular emphasis on any "purpose and flagrancy of the official misconduct" in effecting the initial illegal entry. *Brown*, 422 U.S. at 603-04; *see Greer*, 607 F.3d at 564. Although we have assumed, for the sake of analysis, that the initial entry to Brandwein's home was unlawful, the district court found no bad faith by the officers. The court found that Brown and Thurman sincerely believed that an emergency was unfolding in the house and suspected that someone inside the residence could have been injured or deceased. This finding of good faith is well supported by the record, and we perceive no clear error. Any police misconduct in the initial entry of the home was thus taken in the good faith belief that assistance was required, not with the purpose to investigate the Brandweins.

The passage of time between entry and consent, and the presence of intervening circumstances, also indicate that Debra's consent was not the product of police misconduct. At least an hour passed after the officers first entered the house before Debra consented to the search—significantly more than the fifteen minutes we previously have deemed "sufficient to demonstrate an attenuation of the illegality." *United States v. Whisenton*, 765 F.3d 938, 941-42 (8th Cir. 2014); *see United States v. Barnum*, 564 F.3d 964, 972 (8th Cir. 2009). According to Debra, she sat with her husband in the living room for "quite a while," or fifteen to twenty minutes, before Sergeant Jeffries and Detective Murdick asked her about consent.

Before Debra consented, Detective Murdick informed her that he suspected the fire was caused by a methamphetamine lab, and cautioned her not to touch the glass jars containing suspected residue of methamphetamine. The officers told Debra that she was free to leave or to remain with her husband in the living room. When Debra inquired why Sergeant Jeffries wanted her consent to search, Jeffries told her that police already had found some evidence of drug manufacturing. These intervening circumstances permitted Debra "opportunities . . . to pause and reflect, to decline consent" after deliberate consideration if she wished. *Greer*, 607 F.3d at 564; *see Whisenton*, 765 F.3d at 942. We therefore conclude that Debra's consent was an

independent act of free will that purged any taint arising from what we have assumed, but not decided, was an unlawful entry of the residence.

*     *     *

The judgment of the district court is affirmed.

KELLY, Circuit Judge, concurring.

Three relevant factors for determining whether consent purges the taint of a Fourth Amendment violation include: (1) the passage of time between the Fourth Amendment violation and the voluntary consent; (2) the existence of intervening circumstances; and (3) the purpose and flagrancy of the Fourth Amendment violation. See United States v. Barnum, 564 F.3d 964, 971 (8th Cir. 2009) (citing Brown v. Illinois, 422 U.S. 590, 603–04 (1975)). I write separately to express my concern with how the court considers the first two factors. With respect to the first factor, the court notes that Debra Brandwein consented to the search at least an hour after the officers first entered the house, and that she had been sitting in the living room for fifteen to twenty minutes before any officer asked her about consent to search. See United States v. Whisenton, 765 F.3d 938 (8th Cir. 2014). But counting the passage of time between the presumed unlawful entry and the voluntary consent in this way ignores the fact that the officers never left the house. Because the officers unlawfully remained, their presence was a "continuing violation with no intervening time between the illegality and consent." Whisenton, 765 F.3d at 944 (Bye, J., dissenting). The Fourth Amendment violation was still occurring at the time the officers obtained Debra Brandwein's consent. As a result, there was never a break between the officers' unlawful conduct and the voluntary consent to support a finding that the taint had been purged.

Similarly, I question whether any intervening circumstances were present. Debra Brandwein was told that she could not touch certain items in her home, that evidence of drug manufacturing had already been found, and that officers intended to obtain a search warrant. Perhaps these circumstances gave her an opportunity "to pause and reflect, to decline consent." See United States v. Greer, 607 F.3d 559, 564 (8th Cir. 2010). But it may very well be that these circumstances, occurring as they did while the officers remained unlawfully in her home, simply reinforced her fear and, thus, her decision to acquiesce to the search. Whisenton, 765 F.3d at 944 (Bye, J., dissenting) ("asking for permission to smoke in one's own home is evidence the prolonged unlawful intrusion had a coercive effect on [the person who ultimately gave consent]").

Because this case bears such close factual similarity to Whisenton, I concur in the judgment of the court. Had these issues been presented to us as a matter of first impression, however, I would view these two factors as weighing in favor of the conclusion that Debra Brandwein's consent was not "an independent act of free will" sufficient "to purge the primary taint of the [illegal] entry" into the Brandwein home. Whisenton, 765 F.3d at 941 (alteration in original) (quotation and internal quotation marks omitted).

_____