# United States Court of Appeals
## For the Eighth Circuit

_____

No. 21-2039

_____

United States of America

*Plaintiff - Appellee*

v.

Gary Levell Harris

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Central

_____

Submitted: January 14, 2022
Filed: December 9, 2022

_____

Before COLLOTON, KELLY, and KOBES, Circuit Judges.

_____

KELLY, Circuit Judge.

Gary Harris entered a conditional plea of guilty to one count of being a felon in possession of ammunition. Harris reserved his right to appeal the district court's[1] denial of his motion to suppress and now appeals. We affirm.

_____

[1]The Honorable Kristine G. Baker, United States District Judge for the Eastern District of Arkansas.

## I.

On December 14, 2019, North Little Rock Police Department officer Scott Harton was dispatched to 121 South Spruce Street on a report that a dog had been shot. When Harton arrived, he found a dog bleeding in the street from a close-range gunshot wound to the head. He spoke with the neighbor who had called to report the shooting. She told him that she saw a Black male wearing a black shirt exit 104 South Spruce Street with a handgun. She stated that she then saw the man shoot the dog, open the driver's side door of a nearby Grand Marquis, put something inside of the car, and then walk back inside the house. Harton also spoke with the wounded dog's owner, who heard a gunshot but did not see who fired the gun.

In the meantime, five additional officers arrived on the scene and began attempting to contact the person inside 104 South Spruce Street. They surrounded the house, and one of the officers—armed with an AR-15 patrol rifle—banged on a window and announced the officers' presence. The officers did not approach the front door. Harris eventually stepped out onto the front porch and put his hands in the air. One of the officers pointed a pistol at Harris and motioned for him to come down off the porch. Harris complied. Harton then walked over, handcuffed Harris, and led him away from the house while other officers performed a protective sweep of the residence to make sure no one else was inside.

After Harton read Harris his <u>Miranda</u> rights, he placed Harris in the back seat of his patrol car, and the two discussed the reported shooting. While Harris denied shooting the dog, Harton told him that he matched the physical description of the alleged shooter. Harton then asked Harris for permission to search the Grand Marquis parked outside Harris's house. Harton told Harris that he "knew where the gun was" and if he could look in the car, that would "squash the whole thing." Harris told Harton he was "uncomfortable," and Harton moved the handcuffs from behind Harris's back to his front. After Harris provided both verbal and written permission to search the Grand Marquis, he gave the officers a key to the car to

conduct the search. Harris, still handcuffed, was allowed out of the patrol car, where he stood and watched as the officers searched the car. At no point did Harris revoke his consent. Officers did not find a gun or any other evidence in the Grand Marquis.[2]

Harton then placed Harris back inside the patrol car and asked him for permission to search his residence. Harris initially refused, saying, "I'm not going to sign the consent [']cause I don't have a gun in there[,] and if you don't believe me now, you're not going to believe me later." Harris then asked whether Harton would remove his handcuffs and release him if he consented to the search and officers did not find a gun. Harton responded that this sounded "like a good plan." Harris then signed a written consent to search his home approximately 34 minutes after he was first detained.

Officers searched Harris's house for roughly 20 to 23 minutes. During the search, Harris sat on the couch in his living room. At no point did he revoke his consent. Officers did not find a gun, but they did find several boxes of ammunition on the top shelf of the master bedroom closet. After the search, Harris was released.

On January 9, 2020, a grand jury returned an indictment charging Harris with two counts of being a felon in possession of ammunition. Harris filed a motion to suppress evidence seized during the search[3] of his residence. Harris argued that he was unlawfully arrested inside his home in violation of the Fourth Amendment and that any evidence seized after that arrest had to be suppressed. After a hearing, where Harton and two other law enforcement officers testified, the district court denied Harris's motion. The court declined to decide whether Harris had been unlawfully

---

[2]As the district court notes, "[a]t some point, the officers learned of" Harris's "prior felony convictions."

[3]Harris moved to suppress evidence obtained during this initial search of his residence on December 14, 2019, as well as a subsequent search on December 19, 2019. Harris does not appeal the denial of his motion to suppress the evidence from the December 19 search.

seized because it concluded that the challenged evidence was admissible under the attenuation doctrine based in part on Harris's voluntary consent to search his home. In short, because the district court concluded that the search of Harris's home was sufficiently attenuated from the alleged unlawful arrest to purge the taint of any illegality, the court reasoned that it need not determine the constitutionality of Harris's arrest.

Harris entered a conditional plea of guilty to one count of being a felon in possession of ammunition, reserving his right to appeal the district court's denial of his motion to suppress. The district court sentenced Harris to 21 months of imprisonment and three years of supervised release. Harris timely appealed.

## II.

For purposes of appeal, we assume, as the district court did, that (1) Harris was unlawfully arrested inside his home when officers ordered him outside at gunpoint, handcuffed him, and placed him in a police vehicle; and (2) that the officers' actions were not justified by exigent circumstances. Instead, we turn directly to the application of the attenuation doctrine.

Harris argues the district court erred in denying his motion to suppress because he was unlawfully arrested in his home and the attenuation doctrine does not apply to render the evidence that was seized during a subsequent search admissible against him. "A mixed standard of review applies to the denial of a motion to suppress evidence." United States v. Williams, 777 F.3d 1013, 1015 (8th Cir. 2015). "We review the district court's findings of fact under the clearly erroneous standard, and the ultimate conclusion of whether the Fourth Amendment was violated is subject to *de novo* review." Id. (quoting United States v. Stephenson, 924 F.2d 753, 758 (8th Cir. 1991)).

Under the attenuation doctrine, "[e]vidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been

interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" Utah v. Strieff, 579 U.S. 232, 238 (2016) (quoting Hudson v. Michigan, 547 U.S. 586, 593 (2006)).

The government asserts that Harris's consent to search his home was one such "intervening circumstance" that purged the taint of his alleged unlawful arrest. Under these circumstances, the government must show "(1) that [Harris's] consent was voluntary and (2) that 'the consent was an independent act of [Harris's] free will that purged the taint of the Fourth Amendment violation.'" United States v. Whisenton, 765 F.3d 938, 941 (8th Cir. 2014) (quoting United States v. Greer, 607 F.3d 559, 564 (8th Cir. 2010)).

Harris argues the district court clearly erred when it found that his consent was voluntary. "The government bears the burden of proving voluntary consent to a search by a preponderance of the evidence, and we review a district court's finding of voluntary consent under a clear error standard." United States v. Willie, 462 F.3d 892, 896 (8th Cir. 2006) (citation omitted); see also United States v. Johnson, 619 F.3d 910, 918 (8th Cir. 2010) ("The voluntariness of a consent to search is a factual question that is reviewed for clear error." (quotations omitted)).

Harris appears to concede that he gave verbal permission to search both his home and his car and signed consent forms. He contends, however, that his consent was not voluntary. "The question of voluntariness requires a broad factual inquiry; there is no bright-line rule to determine when an essentially free and unconstrained choice becomes one that is the result of duress or coercion." Willie, 462 F.3d at 896 (cleaned up). Rather, we examine the totality of the circumstances to determine whether consent is knowing and voluntary. United States v. Flores, 474 F.3d 1100, 1104 (8th Cir. 2007) (citation omitted). Relevant factors include, "a defendant's age, intelligence, and education; whether he cooperates with police; his knowledge of his right to refuse consent; and his familiarity with arrests and the legal system." United States v. Bearden, 780 F.3d 887, 895 (8th Cir. 2015). "Also relevant is the

-5-

environment in which consent was given and whether the police threatened, intimidated, punished, or falsely promised something to the defendant; whether the defendant was in custody or under arrest when consent was given and, if so, how long he had been detained; and whether consent occurred in a public or secluded area." Id.

In determining that Harris voluntarily consented to the search of his home—the only location where law enforcement seized items Harris seeks to suppress—the district court found that Harris was 49 years old; displayed general intelligence; did not appear to be intoxicated; consented to the search after being informed of his Miranda rights; signed a consent to search that informed him of his right to refuse consent and to revoke it at any time; and had a prior criminal history, suggesting Harris's familiarity with arrests and the legal system. The district court acknowledged that a few facts weighed in Harris's favor, including that officers had weapons drawn and made misrepresentations to Harris prior to his consent. However, the district court determined that the officers' weapons were put away and no longer displayed when Harris consented to the searches of his car and home, and despite the misrepresentations, officers did not act in a threatening manner when obtaining either consent to search. In addition, the district court found that Harris engaged in conversation with the officers during the searches, and that he watched the search of his home and his car and never revoked consent.

Under these circumstances, we cannot say the district court committed clear error in finding that Harris's consent to search was voluntary. The court expressly considered the relevant factors for assessing voluntariness before reaching its conclusion, including those weighing against a finding of voluntary consent. United States v. Holly, 983 F.3d 361, 363 (8th Cir. 2020) ("We will reverse a finding of fact for clear error only if, despite evidence supporting the finding, the evidence as a whole leaves us with a definite and firm conviction that the finding is a mistake." (quotations omitted)).

Next, we must determine whether Harris's voluntary consent purged the taint of the unlawful arrest.  See United States v. Becker, 333 F.3d 858, 862 (8th Cir. 2003) ("This second inquiry . . . is necessary because voluntary consent to a search, preceded by an illegal police action, does not automatically purge the taint of an illegal detention.").  To determine whether the taint is purged, "we consider '(1) the temporal proximity between the Fourth Amendment violation and the grant of consent to search; (2) the presence of any intervening circumstances; and (3) the purpose and flagrancy of the agents' Fourth Amendment violation.'"  Whisenton, 765 F.3d at 941 (alterations omitted) (quoting United States v. Barnum, 564 F.3d 964, 971 (8th Cir. 2009)).

We begin with temporal proximity, which, under our precedent, we measure "from the point at 'which the agents' conduct became illegal to the time of the consent.'  The closer in time the illegal entry and the defendant's consent occurred, the more likely the illegal entry influenced the consent."  Id. (cleaned up) (quoting United States v. Esquivel, 507 F.3d 1154, 1160 (8th Cir. 2007)).  "In some circumstances, even a lapse of fifteen minutes can be sufficient to demonstrate an attenuation of the illegality."  United States v. LeBeau, 867 F.3d 960, 972 (8th Cir. 2017) (quotations omitted).  Here, approximately 34 minutes elapsed between the time Harris claims he was unlawfully seized and when he consented to the search of his residence.  Temporal proximity therefore weighs in favor of attenuation.

"The presence of intervening circumstances that provide the defendant an opportunity 'to pause and reflect, to decline consent, or to revoke consent' help demonstrate that the illegality was attenuated."  Whisenton, 765 F.3d at 942 (quoting Greer, 607 F.3d at 564).  Here, multiple relevant events occurred between the initial seizure of Harris and his consent to search his residence.  First, Harris received verbal Miranda warnings before consenting to the searches.  See United States v. Yorgensen, 845 F.3d 908, 914 (8th Cir. 2017) ("Providing Miranda warnings is an important, although not dispositive, factor that weighs against suppression[.]") (cleaned up).  Second, as established above, Harris gave verbal and written consent twice, once to search his car and again to search his home; and each written consent

explained his right to refuse. Third, when Harris said he was uncomfortable, officers moved Harris's handcuffs from his back to his front and took him outside of the patrol car where he was able to watch the search of his car. Finally, the officers then put him back inside the patrol car for further discussion before taking him into his house, where he watched the search and conversed with the officers. This series of events afforded Harris an opportunity to pause and reflect on his options.

As to the final factor, the Supreme Court has placed "a particular emphasis on any 'purpose and flagrancy of the official misconduct.'" Id. at 915 (citations omitted). This factor of the attenuation analysis "favor[s] exclusion only when the police misconduct is most in need of deterrence—that is, when it is purposeful or flagrant." Strieff, 579 U.S. at 241 (determining that an officer's "good-faith mistakes" did not rise to a purposeful or flagrant violation of Fourth Amendment rights). Here, Harris points to nothing in the record to indicate that the officers purposefully sought to violate his rights or otherwise engaged in flagrantly unlawful conduct. See id. at 243 ("For the violation to be flagrant, more severe police misconduct is required than the mere absence of proper cause for the seizure."). Without such evidence, this factor does not weigh in favor of suppression.

Weighing the appropriate factors, we conclude that Harris's voluntary consent to the search of his residence was sufficient to purge the taint of the officers' initial unlawful conduct. The district court did not err in denying Harris's motion to suppress evidence obtained from the December 14, 2019, search.

III.

We affirm the judgment of the district court.

_____