# United States Court of Appeals
## For the First Circuit

No. 08-1175

UNITED STATES OF AMERICA,

Appellee,

v.

CLARENCE ANDRADE,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Lynch, Chief Judge,
Howard, Circuit Judge,
and Garcia-Gregory,[*] District Judge.

Mark T. Quinlivan, Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, was on brief, for appellee.
Martin J. Vogelbaum, Assistant Federal Public Defender, for appellant.

December 31, 2008

---

[*]    Of the District of Puerto Rico, sitting by designation.

**GARCIA-GREGORY, District Judge**. Defendant-appellant Clarence Andrade ("Andrade") was charged in the United States District Court for the District of Massachusetts with being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). On January 23, 2007, Andrade filed a motion to suppress the firearms and ammunition seized by Officer Gary Sarmento ("Sarmento") of the New Bedford, Massachusetts Police Department (the "Department"). After holding a suppression hearing, the district court upheld the legality of a stop and frisk performed by Sarmento, which revealed that Andrade had two weapons and ammunition with him. Accordingly, the district court denied Andrade's motion. United States v. Andrade, 502 F. Supp. 2d 173 (D. Mass. 2007). The defendant thereafter entered a guilty plea, reserving the right to challenge the denial of his suppression request. Following the imposition of sentence,[1] the defendant, acting on the reservation, instituted this appeal.

## FACTUAL AND PROCEDURAL BACKGROUND

"We recount the relevant facts as the trial court found them, consistent with record support." United States v. Ngai Man Lee, 317 F.3d 26, 30 (1st Cir. 2003). Shortly after midnight on January 22, 2006, New Bedford police received numerous reports of shots being fired. The New Bedford police members that responded to

---

[1] On January 24, 2008, Andrade was sentenced to one hundred eighty (180) months imprisonment, forty-eight (48) months of supervised release, and a $ 100 assessment.

these reports recovered numerous shell casings from the area of Purchase Street and Madison Street. About an hour later, two men that confessed to being in the area were admitted into St. Luke's Hospital with non-life threatening gunshot wounds.[2]

On that same date, at 2:25pm, a 911 caller reported a shooting threat to a New Bedford, Massachusetts police operator. After being told by the operator that he was on a recorded line, the caller reported that "[t]hree guys [are] looking to start with some other guy outside on the street here" and confirmed that he was calling from 37 Madison Street. The caller further stated that each of the three men were wearing a hooded sweatshirt - one white, one gray, and one black. The caller told the operator that one of the three men threatened the man who lived in the third floor of 37 Madison Street, telling him that "I'll come back and shoot you or kill you or whatever." In addition, the caller stated that the three men were "walking south on [what] looks like Pleasant Street." The operator, who had a caller ID display showing the name and address associated with the calling telephone number, took notes of the caller's statements.

Sergeant John T. Catterall ("Catterall"), the Department's patrol supervisor at the time, received a textual report of the call on a mobile data computer in his cruiser. The

---

[2] The two men conceded to being in the area, but provided no further information.

report indicated that the caller was the first floor tenant at 37 Madison Street and that the potential victim was the third floor tenant. After reading the report, Catterall radioed the Department's dispatcher to send other officers to the Madison Street area, telling her that he would go there as well. The dispatcher then broadcasted over the police radio system:

> 12 and 13, can you make your way [to] 37 Madison Street? There's a complainant on the first floor saying, uh, guess some males were arguing with a party that lives on the third floor here, and they threatened to come back and shoot the party. Uh, they are going to be three males, all had hooded sweatshirts, uh, black, gray and white in color. Left south on Pleasant Street on foot.

Several officers notified Catterall that they were headed to the Madison Street area, among them was Sarmento. Catterall proceeded to 37 Madison Street and interviewed the first floor tenant. Before he began his interview, Catterall heard over his walkie-talkie that Sarmento had stopped several males at Russell and Purchase Streets that matched the description of the caller.

After receiving the Department's dispatch, Sarmento had confirmed with the dispatcher that the males were "walking south on Pleasant from Madison" and that he was in the area. The officer then proceeded to look for the men matching the caller's description. Sarmento did not see anyone on Pleasant Street. However, three houses down on the next intersection he observed that five individuals were walking south on Purchase Street. The

-4-

officer noted that three of the individuals were males clad in a black, gray, and white hooded sweatshirts respectively. Sarmento pulled over and ordered the individuals to stop. Four of the individuals stopped. Only one refused to obey Sarmento's order: Andrade. Sarmento then put his arm out to stop Andrade and the defendant continued forward, walking into Sarmento's arm. Andrade refused to make eye contact and looked around as if he was attempting to flee. Additionally, Andrade and another of the males had their hands in their front pockets. Sarmento also recognized one of the other males as having a criminal history and as having been involved in violent gang related activities. Sarmento then grabbed Andrade by his sweatshirt and held him against the trunk of his police cruiser, bent over at the waist. The officer did the same thing to the other male who had his hands in his pocket. Sarmento later testified that he was concerned that the men might be armed and that he felt he was in danger. Another officer arrived at the scene and Sarmento requested that said officer take control of the second male. Sarmento then turned his attention to Andrade to frisk him for weapons. He was able to observe that Andrade had the handle of a firearm sticking from his waistband. Sarmento was able to see the handle of the weapon because Andrade's sweatshirt had bunched up around the back of his neck and had been pulled up above his waist when he was bent at the waist over the police cruiser. Sarmento seized the weapon, placed Andrade on the

sidewalk, handcuffed him, and began to frisk him further. This frisk led to his finding a second handgun together with a bag containing ammunition, which the officer seized. Sarmento then arrested Andrade.

While these events were taking place on Purchase Street, Catterall had gone to the building at 37 Madison Street where the 911 caller lived. Catterall interviewed the caller, Jason Alcock ("Alcock"), who shared the last name and the residence with the registered owner of the place from which the 911 call was made. Alcock confirmed that he had made the 911 call. Following his conversation with Alcock, Catterall interviewed Ernie Souza ("Souza"), the third-floor tenant at 37 Madison. The interview with Souza revealed that Alcock had related the facts incorrectly to the 911 operator. Souza told Catterall that while he was lighting firecrackers, three men stopped to admonish him telling him that it was not smart for him to light firecrackers when there had been a shooting nearby earlier that morning. Souza stated that the three men had not threatened to shoot him and that after an unfriendly exchange of words the men had walked off. Sarmento could not have been aware of this information when he stopped and frisked Andrade.

Andrade was charged in the United States District Court for the District of Massachusetts with being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). On January 23, 2007, Andrade filed a motion to suppress the

firearms and ammunition seized. After holding a suppression hearing, the district court denied the motion. The district court upheld the legality of Andrade's stop because the totality of circumstances at the time were sufficient for Sarmento to have a reasonable suspicion that Andrade was involved in wrongdoing. Specifically, the district court found that the totality of the following facts provided Sarmento with a reasonable suspicion of criminal activity justifying Andrade's stop: (1) Sarmento was an experienced officer, who was familiar with gang activity in New Bedford; (2) he was aware that the area where Andrade was stopped and frisked was a high-crime area and that two individuals had been shot in that vicinity approximately fourteen (14) hours earlier; (3) no suspects had been identified in that shooting; (4) Sarmento was responding to a radio dispatch warning that, a few minutes earlier, three males wearing black, white, and gray hooded sweatshirts had threatened to shoot another person; (5) Sarmento spotted five individuals walking in the direction described by the dispatch caller; and (6) three of them were wearing hooded sweatshirts that matched the description of the dispatch caller.

The district court also held that Sarmento had a reasonable basis to perform a pat down frisk on Andrade. First, the court noted that Sarmento recognized that one of the individuals had been involved in violent gang activity. Second, Andrade ignored Sarmento's order to stop and walked into the officer's arm. Third,

Andrade refused to make eye contact and looked around as if he wanted to flee. Fourth, Sarmento noted that Andrade's hands were in his pocket, possibly concealing a weapon. Finally, the district court noted that Sarmento testified at the suppression hearing that he felt outnumbered and in danger when he decided to secure Andrade against the trunk of his car, in order to check him for weapons.

Andrade argued in the district court that Sarmento's search was more intrusive than a mere frisk because the officer lifted his sweatshirt to find one of the guns when he pushed him against the trunk of the car. The other gun and ammunition was found after Sarmento handcuffed Andrade and further frisked him for weapons. At the hearing, the district court allowed defense counsel to wear the sweatshirt worn by defendant on the day of the events and Sarmento to simulate how Andrade was pushed against the trunk. During the simulation, Andrade's sweatshirt rode up on its own revealing counsel's waist. The district court determined that Sarmento's testimony was credible and that the demonstration was in accordance with his testimony of how he came about the gun in Andrade's waistband. In addition, the district court heard the testimony of Officer Michael Oliver ("Oliver"), who arrived at the scene after Sarmento and secured one of the other males, while Sarmento concentrated on Andrade. The district court determined that Oliver's testimony was credible and that the word "search" did not properly describe Sarmento's action. In conclusion, the

district court held that under the totality of circumstances, Sarmento had a reasonable suspicion that Andrade was involved in the reported altercation and that he could have been armed, which justified the stop and frisk.

Following the district court's decision, defendant entered a guilty plea, reserving the right to challenge the denial of his suppression request. Following the imposition of sentence, the defendant, acting on the reservation, instituted this appeal. Andrade argues that Sarmento did not have a reasonable suspicion of criminal activity justifying his stop and frisk. Furthermore, Andrade claims that the frisk performed on him exceeded permissible bounds. As such, Andrade requests that this court vacate his conviction, reverse the district court's denial of his motion to suppress, and remand this case for further proceedings.

**STANDARD OF REVIEW**

This court applies a mixed standard of review for orders granting or denying suppression. United States v. Ruidíaz, 529 F.3d 25, 28 (1st Cir. 2008). The court reviews a district court's findings of fact and credibility determinations on a suppression motion for clear error and its conclusions of law de novo. Id.; United States v. Garner, 338 F.3d 78, 80 (1st Cir. 2003). This court "will uphold a denial of a motion to suppress if any reasonable view of the evidence supports it." Garner, 338 F.3d at 80.

**DISCUSSION**

A temporary police detention constitutes a seizure under the Fourth Amendment. Terry v. Ohio, 392 U.S. 1, 19 (1968); Ruidíaz, 529 F.3d at 29. Hence, such detention must be reasonable in order to pass constitutional muster. Id. "The oversight of brief investigatory stops has two aspects." Ruidíaz, 529 F.3d at 29. First, in order to make the initial stop, a police officer must have a reasonable, articulable suspicion of an individual's involvement in some criminal activity. Id.(citing Terry, 392 U.S. at 21; United States v. Chhien, 266 F.3d 1, 6 (1st Cir. 2001)). Second, any action undertaken pursuant to that stop must be reasonably related in scope to the stop itself "unless the police have a basis for expanding their investigation." United States v. Henderson, 463 F.3d 27, 45 (1st Cir. 2006). Thus, it is insufficient that the stop itself is valid because there must also be a separate analysis of whether the pat-frisk is reasonable. United States v. McKoy, 428 F.3d 38, 39 (1st Cir. 2005).

The inquiry into reasonableness requires a reviewing court to consider the totality of the surrounding circumstances. United States v. Romain, 393 F.3d 63, 71 (1st Cir. 2004). "This inquiry is fact-sensitive," and, therefore, "requires a practical, commonsense determination." Ruidíaz, 529 F.3d at 29. This determination "entails a measurable degree of deference to the perceptions of experienced law enforcement officers." Id.

-10-

Furthermore, "[b]ecause reasonable suspicion is a protean concept, suspicion sufficient to justify an investigatory stop may be rooted in any of a variety of permissible scenarios." Id. "The reasonableness of a search entails an objective inquiry into the search from the perspective of the searching officers." United States v. Aitoro, 446 F.3d 246, 253 (1st Cir. 2006).

Andrade individually attacks the factors that the district court relied on to determine that Andrade's stop and frisk was lawful and then argues that the totality of these circumstances do not sustain the reasonableness of Andrade's stop and frisk. The Supreme Court has warned that, in determining the reasonableness of a stop and frisk, a court should not engage in "divide-and-conquer analysis," isolating the individual factors underlying an officer's suspicion to determine whether any given factor is "by itself readily susceptible to an innocent explanation" and thus "entitled to 'no weight.'" United States v. Arvizu, 534 U.S. 266, 274 (2002). Rather, the critical inquiry is whether reasonable suspicion arose under the totality of the circumstances. Even if "each of [a] series of acts was 'perhaps innocent in itself,'" the Court has held that, "taken together," they may justify a stop and frisk. Id. (quoting Terry, 392 U.S. at 22).

In this case, the totality of the circumstances facing Sarmento were clearly sufficient to give him a "'particularized and objective basis' for suspecting legal wrongdoing." Id. at 273.

-11-

Beyond this, we reject defendant's attacks on the individual factors.

Andrade first claims that the 911 call in this case should not have been accorded any weight because the caller was anonymous and did not report an actual threat. Andrade relies on Florida v. J.L., 529 U.S. 266 (2000), which holds that truly anonymous tips must be corroborated in some meaningful way in order to justify crossing the reasonable suspicion threshold. Ruidíaz, 529 F.3d at 30. However, not every 911 call from a nameless source can truly be considered anonymous. Id. When determining whether to afford any weight to a nameless 911 call, the proper test "does not hinge on the definition of 'anonymous' but, rather, on whether the 911 call possessed sufficient indicia of reliability." Id. at 31. "That determination must be made in light of all the circumstances." Id.

In the present case, Alcock, the caller, made no attempt to hide his identity. Even though Alcock did not state his name, after being told that he was on a recorded line, he confirmed that his location was 37 Madison. Moreover, the operator had a caller ID display showing the name and address associated with the calling telephone number. Additionally, the caller made comments about what was happening outside his home. Another circumstance that weighs in favor of the 911 call's reliability is the fact that the radio dispatch received by Sarmento ordered him to look for three males

that had made a shooting threat with the description given by the caller, i.e. three young males with hooded sweatshirts, one white, one gray, and one black, and Sarmento saw three males matching said description walking on Purchase Street near the area where the shooting threat was made.[3] As such, the just mentioned facts taken together, show that the 911 call possessed sufficient indicia of reliability. Ruidíaz, 529 F.3d at 31 (finding that a 911 call from a nameless source was reliable because among other things the caller was "aware that his identity could easily be unearthed").

Next, Andrade contends that the record does not support the conclusion that the area was a high-crime area because none of the officers involved could specifically delineate which area was a high-crime area. Andrade further argues that the most prevalent criminal activity in the area was gang related, which is not the type of crime involved in the case before this court. Additionally, Andrade claims that no one testified that the shootings that occurred at the intersection of Purchase and Madison Street, fourteen hours before Andrade's stop and frisk, were gang related.

The relevant evidence for a factual finding that an area is a high-crime area "will include some combination of the following: (1) the nexus between the type of crime most prevalent

---

[3] The district court acknowledged that Purchase Street was very near the area where the shooting threat was reported to have occurred and where the suspects where reportedly headed.

or common in the area and the type of crime suspected in the instant case; (2) limited geographic boundaries of the 'area' or 'neighborhood' being evaluated; and (3) temporal proximity between evidence of heightened criminal activity and the date of the stop or search at issue." United States v. Wright, 485 F.3d 45, 53-54 (1st Cir. 2007).

At the suppression hearing, the district court heard the testimony of Sarmento, who testified that on the morning of January 22, 2006 he received a memorandum indicating that earlier that day, shortly after midnight, a shooting had occurred at the intersection of Purchase and Madison Street and that officers had recovered a number of shell casings. Furthermore, Sarmento was asked whether the area of Purchase and Madison Street falls into a high-crime or low-crime area of New Bedford. The officer testified that the area around Purchase and Madison Street is an area with a lot of police activity due to the high level of criminal activity.[4] Sarmento also indicated that the area has been the location of a number of shootings throughout the years.[5] The district court found Sarmento's testimony to be credible and determined that the area around Purchase and Madison Street, which included the area where

---

[4] In determining whether an area is high in crime, courts may consider evidence which includes a mix of objective data and the testimony of officers, describing their experiences in that area. Wright, 485 F.3d at 54.

[5] Officer Oliver also testified that the area where Andrade was stopped and frisked is a high-crime area.

-14-

Andrade was stopped and frisked, was a high-crime area.  We see no reason to disturb that finding.[6]

Sarmento  testified that he had been a police officer for fifteen (15) years, spending nearly eight of those years patrolling the area around Purchase and Madison Street. Moreover, Sarmento mentioned that, at the time he was in the Community Policing Division of the Department, he answered regular routine police calls in the area. Sarmento further indicated that through the years he had responded to incidents in the area involving: "weapons shootings, stabbing, things of that nature."[7] Number 37 Madison Street is one house away from the intersection of Madison and Purchase. Moreover, the area where Andrade was stopped and frisked is one block away from where the earlier shooting had taken place. Thus, the area where the shooting threat was made and where Andrade was stopped and frisked falls within the area described by Sarmento as having a heightened level of criminal activity. The area was known for having shooting incidents and one such incident had

---

[6] This court must "exhibit great respect for the presider's opportunity to hear the testimony, observe the witnesses' demeanor, and evaluate the facts at first hand." United States v. Nee, 261 F.3d 79, 84 (1st Cir. 2001)(citing United States v. Zapata, 18 F.3d 971, 975 (1st Cir. 1994)).

[7] Sarmento also testified that he recalled Andrade's face from a wanted poster. However, Andrade argues that Sarmento's testimony that he recalled Andrade's face from a wanted poster cannot contribute to the reasonable suspicion calculus. The district court decided not to consider this factor in its totality of the circumstances analysis. Likewise, we will not consider this factor.

occurred in the same area fourteen (14) hours earlier. As such, we find that there is a nexus between the type of crime most prevalent or common in the area and the type of crime suspected in the instant case. Furthermore, there is a temporal proximity between evidence of heightened criminal activity and the date of the stop and frisk at issue. Accordingly, we agree with the district court's finding that the area where the aforementioned incidents occurred was a high-crime area.[8]

Andrade also contends that Sarmento's experience as a police officer is in gang related activities and, therefore, irrelevant to Andrade's case because there is no evidence that the argument between the three men and Souza was gang related. This argument is unavailing. Sarmento may draw on his "own experience and specialized training to make inferences from and deductions about the cumulative information ... that might well elude an untrained person." United States v. Jones, 432 F.3d 34, 40 (1st Cir. 2005)(internal citations omitted). The fact that Sarmento has experience in gang related activities does not mean that he does not have experience in shootings. Sarmento testified that as a police officer for the past fifteen (15) years, he had substantial experience in dealing with people in gangs in the Madison and Purchase Street area. The officer further stated that through the

_____

[8] The clearly erroneous standard is applied to the factual finding that an area was high in crime. Wright, 485 F.3d 45, 53 (1st Cir. 2007).

-16-

years he has responded to incidents in the area involving: "weapons shootings, stabbing, things of that nature." Hence, the district court did not err in taking into consideration Sarmento's experience because he had been a police officer in the Madison and Purchase Street area for many years and, in addition to his experience with gang related activities, he had responded to shooting incidents in the area.

Furthermore, Andrade contends that the fact that Sarmento had a subjective belief that he was in danger because he was dealing initially with five persons by himself is irrelevant because Sarmento knew that other officers were on the way. The district court found that Sarmento's testimony that he felt he was in danger was credible. Even though Sarmento later acknowledged that he knew that other officers were on their way, Sarmento testified that he felt in danger. Sarmento stated that Andrade had refused to stop, looked around as if he wanted to flee and he and another of the males had their hands in their pockets. The officer was concerned that both of them may have been concealing weapons. According to Andrade, his behavior in continuing to walk when ordered to stop and in keeping his hands in his sweatshirt pocket may not be used to generate a reasonable suspicion. Andrade alleges that his refusal to obey Sarmento's order does not of itself generate reasonable suspicion. Additionally, Andrade avers that he had his hands in the pocket of his sweatshirt because the events

occurred in January, a month known for its cold weather. Moreover, Andrade alleges that he refused to make eye contact because he was nervous. Andrade claims that these circumstances taken together do not amount to a reasonable suspicion that he was involved in criminal activity. We disagree.

The district court did not clearly err in crediting Sarmento's subjective feeling that he was in danger. As previously mentioned, Sarmento was in a high-crime area[9] and Andrade was accompanied by four other persons. Andrade refused to obey Sarmento's order to stop, walking into his outstretched arm. Additionally, Andrade had his hands in his pocket, and refused to make eye contact. We find that under these circumstances, Sarmento's belief that he was in danger was objectively reasonable and a justified reaction to the situation. Sarmento could reasonably have thought that Andrade was concealing a weapon and posed a threat to his safety. See, e.g., United States v. Soares, 521 F.3d 117, 121-122 (1st Cir. 2008)(stressing, in determining whether the district court had reasonable suspicion, that the officer's judgment that the defendant posed a threat was objectively reasonable because he refused repeated orders to remain

---

[9] This court recognizes that the character of a neighborhood does not provide the police with automatic permission to stop and search someone in a high-crime neighborhood. United States v. Soares, 521 F.3d 117, 121 (1st Cir. 2008)(internal citations omitted). Nonetheless, "every case must be considered on its own reasons for suspicion of danger." Id.

still and keep his hands in the officer's view and because he became increasingly agitated as the stop progressed). Andrade offers innocent explanations for the fact that he had his hands in his pocket and was looking around. However, the relevant question is not whether there was an innocent explanation for any particular factor, but rather the degree of suspicion that Sarmento could reasonably attach to these factors in light of the surrounding circumstances. Ruidíaz, 529 F.3d at 32.

Finally, Andrade contends that even if there was a reasonable suspicion justifying the stop and frisk, Sarmento's frisk exceeded permissible bounds. Specifically, Andrade argues that Sarmento exceeded the scope of a Terry stop and frisk when the officer grabbed his sweatshirt and held him against the trunk of the police cruiser. Andrade argues that Sarmento should have stopped to question the group instead of choosing a more physically intrusive route. This argument, however, overlooks the reality of the situation that Sarmento was confronting. Andrade refused Sarmento's order to stop, running into the officer's arm. Furthermore, Sarmento was alone and felt he was in danger because Andrade did not look at him and had his hands in his pockets where he could have been concealing a weapon. Moreover, Sarmento recognized one of the individuals who were with Andrade as being involved in violent gang activity. Sarmento's actions -- grabbing

Andrade and holding him over the trunk of his car -- were reasonably responsive to these circumstances.

## CONCLUSION

For the reasons stated above, we find that Sarmento's actions were reasonable under the totality of circumstances. As such, the district court's denial of Andrade's Motion to Suppress is **AFFIRMED.**